JN:WPC
F. #2019R01077

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

DENNY MARTIN,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

To Be Filed Under Seal

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT

(18 U.S.C. § 1347)

No. 19-MJ-847

EASTERN DISTRICT OF NEW YORK, SS:

      Michelle Sperruggia, being duly sworn, deposes and states that she is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") duly appointed according to law and acting as such.

      Upon information and belief, in or about and between June 2015 and January 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DENNY MARTIN, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain, by means of material false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody of, Medicare in connection with the delivery of and payment for health care benefits, items, and services.

      (Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been employed as a Special Agent with HHS-OIG for approximately eight years. During my tenure with HHS-OIG, I have participated in the investigation of numerous cases involving criminal health care fraud during which I have interviewed witnesses, conducted physical surveillance, executed search warrants and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the laws and regulations related to the administration of the Medicare program and other health care benefit programs. I am currently assigned to investigate health care fraud violations, including schemes to defraud Medicare and Medicaid programs.

2. I have been personally involved in the investigation relating to allegations of violations and attempted violations of 18 U.S.C. § 1347 (health care fraud) by the defendant DENNY MARTIN and others known and unknown.

3. I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in the investigation, (b) discussions with other law enforcement agents involved in this investigation and (c) information obtained from witnesses, among other sources of evidence.

4. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts I learned from other law enforcement agents or civilian witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant DENNY MARTIN,

I have not set forth each and every fact learned during the course of the investigation described below. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part.

PROBABLE CAUSE

I. Background

   A. The Medicare Program

   5. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

   6. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

   7. Medicare was subdivided into multiple parts. Medicare Part A covered health care services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare Part B was the medical insurance program that covered, among other things, certain physician services, outpatient services and other services, such as mental health services and occupational therapies that were medically necessary and rendered by licensed medical doctors or other qualified health care providers. Medicare Part C, commonly referred to as Medicare Advantage ("MA"), was administered by private health insurance companies and provided beneficiaries with all of the services provided under

Medicare Parts A and B (except hospice care), as well as some mandatory supplemental benefits and optional supplemental benefits.

8. Medicare Part C beneficiaries chose to enroll in a managed care plan administered by private health insurance companies or health maintenance organizations. A number of entities were contracted by CMS to provide managed care to Medicare Part C beneficiaries through various approved plans. United Health Care ("UHC") was one of the insurance plans that contracted with CMS to provide managed care to beneficiaries under Medicare Part C, which covered office visits and related health care benefits, items, and services. Because UHC was part of Medicare Part C, and therefore an MA, it was responsible for receiving, adjudicating and paying the claims of authorized network providers seeking reimbursements for the cost of health care benefits, items and services supplied to Medicare Part C beneficiaries.

9. Physicians who perform medical services in connection with the Medicare program applied for and were given a number called the National Provider Identifier number. The number allowed the physicians to submit bills, commonly referred to as "claims," for payment to Medicare, through UHC, to seek reimbursement for medical services that the physicians had supplied to Medicare Part C beneficiaries.

10. To receive payment from Medicare through UHC, a physician was required to submit a health insurance claim form, known as Form HCFA-1500 ("HCFA 1500") through which the physician was required to certify that the claims were true, correct, complete and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The physician was also required to certify that the services being billed were medically necessary and were in fact provided as billed. UHC

permitted authorized participant physicians to submit these claims either electronically or in hard copy claim forms.   Each claim form required certain important information, including: (a) the supplier's unique Medicare identification number; (b) the Medicare beneficiary's name, address and date of birth; (c) the Medicare beneficiary's identification number; (d) the name and identification number of the physician who ordered the item or service; (e) the health care products, items or services supplied to the beneficiary; (f) the applicable Medicare billing codes for these products or services; (g) the date of service; and (h) the diagnosis.

11. Under MA regulations, Medicare Part C would pay for the cost of participant physician services provided to a beneficiary.   For UHC to pay for such physician services, the procedure in question must have been both medically necessary and actually performed.

B. <u>The Defendant and Related Entity</u>

12. The defendant DENNY MARTIN, a licensed neurologist in the State of New York, was the sole owner of AM PM Medical P.C. ("AM PM"), a business that contracted with doctors to provide medical services to patients.   AM PM was located at 930 Grand Concourse, Bronx, New York.

C. <u>The Fraudulent Scheme</u>

13. In or about and between approximately June 2015 and January 2019, the defendant DENNY MARTIN, together with others, engaged in a fraudulent scheme in which he submitted and caused to be submitted claims for reimbursement to Medicare for services purportedly performed, when such services were in fact never performed. Specifically, MARTIN, as the sole owner of AM PM, submitted claims directly to Medicare

Part C, through UHC, for medical services purportedly conducted on Medicare beneficiaries at the beneficiaries' residences when, in fact, those services did not occur and were falsely billed.

14. AM PM maintained a bank account with a bank account number ending in 5172, at Bank 1 ("Account 1"). Account 1 was opened on or about September 23, 2013, for DENNY MARTIN, M.D., P.C. and the signatories for Account 1 were the defendant DENNY MARTIN and another individual. Medicare Part C reimbursements for claims submitted by AM PM were deposited into Account 1.

    i.    Doctor-1

15. Law enforcement officers interviewed a licensed doctor of internal medicine ("Doctor-1"), an individual whose identity is known to your affiant. Doctor-1 worked for the defendant DENNY MARTIN at AM PM as an independent contractor between approximately June 2015 and 2017.

16. A review of the Medicare billing records for Doctor-1 while Doctor-1 was employed at AM PM revealed that AM PM billed Medicare for home visits purportedly performed by Doctor-1, which were in fact never performed. Specifically, Medicare claims data revealed that AM PM billed 3,208 claims through UHC for home health visits purportedly performed by Doctor-1 during the period from approximately June 2015 to September 2018, which included a period of time when Doctor-1 no longer worked for AM PM, for an approximate total amount of $803,000 in reimbursements sought. Doctor-1 told law enforcement officers, in sum and substance, that Doctor-1 did not conduct home health visits of patients while employed by AM PM.

ii.   Doctor-2

17.   Law enforcement officers also interviewed a second licensed medical physician ("Doctor-2"), an individual whose identity is known to your affiant.   Doctor-2 worked for the defendant DENNY MARTIN at AM PM between 2016 and April 2018. Doctor-2 was not a podiatrist.

18.   A review of Medicare claims data revealed that AM PM submitted 562 podiatry claims through UHC during the period from approximately January 2016 to September 2018, for an approximate total amount of $81,697 in reimbursements sought with respect to podiatric services purportedly performed by Doctor-2 on AM PM patients. Doctor-2 told law enforcement officers, in sum and substance, that Doctor-2 did not perform any podiatric services during Doctor-2's employment at AM PM, and did not authorize or know about the submission of such claims.

iii.   AM PM Patients

19.   Law enforcement officers interviewed Patient-1, an individual whose identity is known to your affiant.   Patient-1 was a resident of Queens, New York and purportedly received services from AM PM.   A review of Medicare claims data indicated that Doctor-1 performed medical services for Patient-1, including a home health visit on or about December 27, 2018, for which Medicare reimbursed AM PM in the amount of $305. Patient-1 told law enforcement officers, in sum and substance, that Patient-1 did not know Doctor-1 and that no home visit had ever occurred.

20.   Law enforcement officers interviewed Patient-2, an individual whose identity is known to your affiant.   Patient-2 was a resident of Queens, New York and purportedly received services from AM PM.   A review of Medicare claims data indicated

that Doctor-1 performed medical services for Patient-2, including home health visits on or about October 10, 2018, October 12, 2018, November 1, 2018 and November 10, 2018, for which Medicare reimbursed AM PM in the amounts of $119.66, $117.72, $166.36 and $205.86, respectively. Patient-2 told law enforcement officers, in sum and substance, that Patient-2 had no home health services performed from AM PM.

21. Law enforcement officers interviewed Patient-3, an individual whose identity is known to your affiant. Patient-3 was a resident of Queens, New York and purportedly received services from AM PM. A review of Medicare claims data indicated that Doctor-1 performed medical services for Patient-3, including home health visits on or about January 3, 2019, for which Medicare reimbursed AM PM in the amount of $95.88. Patient-3 told law enforcement officers, in sum and substance, that Patient-3 did not know Doctor-1 and that no home health visit had ever occurred.

22. Law enforcement officers interviewed Patient-4, an individual whose identity is known to your affiant. Patient-4 was a resident of Queens, New York and purportedly received services from AM PM. A review of Medicare claims data indicated that Doctor-2 performed podiatric services for Patient-4 at Patient-4's residence on or about December 27, 2017 and July 10, 2018, for which Medicare reimbursed AM PM in the amounts of $42.60 and $43.30, respectively. Patient-4 told law enforcement officers, in sum and substance, that Patient-4 does not know any doctor from AM PM.

23. Law enforcement officers also interviewed Patient-5, an individual whose identity is known to your affiant. Patient-5 was a resident of Queens, New York and purportedly received services from AM PM. A review of Medicare claims data indicated that Doctor-2 performed podiatric services for Patient-5 at Patient-5's residence on or about

October 11, 2018, for which Medicare reimbursed AM PM in the amounts of $39.50. A review of Medicare claims data also indicated that the defendant DENNY MARTIN performed medical services for Patient-5, including a home health visit on or about January 4, 2019, for which Medicare reimbursed AM PM in the amount of $205.06. Patient-5 told law enforcement officers, in sum and substance, that Patient-5 does not know any doctor from AM PM.

WHEREFORE, your deponent respectfully requests that the defendant DENNY MARTIN be dealt with according to law.

*Michelle Sperruggia*
Michelle Sperruggia
Special Agent
United States Department of Health and Human Services

Sworn to before me this
24 day of September, 2019

*Robert Levy*
THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK